**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Charles Wade,**

    *Plaintiff*,

v.                                                                         Case No.: 3:17-cv-051
                                                                       Judge Thomas M. Rose

**Montgomery County, Ohio et al.,**

    *Defendants.*

___

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT, ECF 61, AND GRANTING MOTION FOR LEAVE TO FILE AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ECF 75. SUMMARY JUDGMENT IS AWARDED TO DEFENDANT JOSHUA LIGHTNER, SCOTT LANDIS AND SHERIFF PLUMMER IN THEIR PERSONAL CAPACITY AND TO ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY. SUMMARY JUDGMENT IS DENIED TO CHARLES EVERSOLE AND TO THE COUNTY, EXCEPT THAT SUMMARY JUDGMENT IS AWARDED ON THE CLAIMS OF CONSPIRACY AND SPOLIATION**

___

Pending before the Court is Defendants' Motion for Summary Judgment, ECF 61.[1] Plaintiff Charles Wade is suing multiple defendants over his treatment while being transferred from Ohio Highway Patrol custody to that of the Montgomery County Jail. Defendants will be awarded summary judgment for claims stemming from officers grabbing and manipulating Wade's wrists while securing his wrists to a restraint chair he was largely strapped into, while claims

---

[1] Also pending is Defendants' Motion for Leave to File Affidavit in Support of Motion for Summary Judgment. ECF 75. This motion is granted.

stemming from the decision to pepper spray him while so restrained, and *Monell* liability stemming from this decision, will be allowed to go forward.

**Background**

On October 17, 2016, Plaintiff Charles Wade was intoxicated and arrested for OVI by the Ohio State Highway Patrol. (Deposition of Charles Wade, ECF 57; 29, 33, 36, 64:16) The Highway Patrol Troopers handcuffed Wade, placed him in a cruiser, and brought him to the Montgomery County Jail. (Depo. Wade 37) On the way to the Jail, the trooper contacted the Jail and advised them to be prepared for an uncooperative inmate. (Depo. Wade, p. 36-37, 52). Dispatch forwarded this information to Defendant John Eversole, who was working that night as the booking sergeant on the first floor of the jail. (Depo. Eversole 52:22, 137:24.) Eversole grabbed a hand-held video camera, which per policy, was required to record any use of force and/or anticipated use of force. (Depo. Eversole 139:8; Exhibit 10.)

Eversole recorded the encounter with Wade on the Jail's hand-held video camera. (Depo. Eversole 141). The incident was also captured on the Jail's closed-circuit security camera system. These two sets of videos have been compiled through editing into a fluid video.

Eversole gathered his "troops" to meet Wade in the jail's sally port where Wade was handcuffed in the back of the patrol vehicle. (Depo. Eversole 136:24, 139:8. ECF 931, 934) Four of the Jail staff, Eversole, Defendant Joshua Lighter, Corrections Officer Kordik and Corrections Officer Cornley, participated in removing Wade from the back seat of the trooper's cruiser. (Deposition of Sgt. John Eversole, ECF 58, p. 141:25, Depo. Cornley, ECF 54, at 56:11). Wade asked Eversole if they were going to "chair" him. (Depo. Wade 52:5, 52:19; Eversole 141:25.) Wade was brought into the receiving room from the sally port and cooperated in being

2

patted down. (Depo. Wade 55:4; Eversole 141:11.)   During this pat down in the inner receiving room, Wade struck his head on a blue pad on the wall. (Depo. Wade 55:22, 58:10. Eversole 146:6.)   Eversole admitted that Wade striking his head was self-harming at most, but not a threat to jail staff. (Depo. Eversole 146:6.)   Eversole ordered Wade to the ground on a pad and ordered Lightner to place his knee on his back. (Depo. Wade 59:22)

Eversole decided to place Wade in the restraint chair. (Depo. Eversole, 147:15). Eversole admitted that there were less restrictive means for dealing with an intoxicated inmate like Wade, like placing him in a cell to simply sober up. (Depo. Eversole 76:7.)   Regardless, Wade was moved into the booking area, just outside the inner receiving room and, while still handcuffed, was placed in the restraint chair. (Depo. Wade 61:8; Eversole 149:3.)

The restraint chair utilized in the Jail has seven straps that keep an inmate in the chair and unable to move.   Both legs are strapped to the chair at the inmate's ankles, a lap belt goes across the waist, both arms are secured to the chair at the wrists and both shoulders are strapped back into the chair. (Depo. Eversole 113:2).   Upon sitting down, Wade told Sgt. Eversole that having his hands cuffed behind his back while seated in the restraint chair was painful and Eversole responded that the cuffs would be removed shortly, and that his arms would be strapped to the chair. (See Video identified as Exhibit 29A to Depo. Eversole, at 3:23-3:35).   Wade responded, "Well, we'll see about that, won't we sir."

There were four corrections officers in addition to Eversole surrounding Wade and strapping him into the restraint chair. (Depo. Eversole 152:23.)   Both of Wade's ankles were strapped to the chair and the lap belt was secured, while he still remained handcuffed. (Depo. Wade 63:8; Eversole 149:3.)   Eversole admits that it would have been very difficult for Wade

to stand up at that point, given the two leg restraints and lap belt. (Depo. Eversole 156:2.) Defendant Joshua Lightner then instructed Wade to lean forward and corrections officer Jameson Kordik, whom Eversole knew was a college wrestler, took control of Wade's head and pushed it into his lap. (Depo. Eversole 178:7; (Ex. 29A, at 3:40). Hence, given the number of corrections staff, Wade being partially restrained in the chair, still handcuffed, there was nothing he could have effectively done to himself or corrections staff at that point.

With Wade's head in his lap, Lightner started to manipulate Wade's wrist causing him pain, under the auspices of taking off his handcuffs to secure his wrists onto the chair. (Depo. Wade 61:22, 64:29, 65:25, 66:13. Eversole 157:17.) Wade reacted by flailing in pain, and shouting "What the fuck are you fuckers doing to my hands?" (Depo. Wade 65:13 (Ex. 29A, at 3:52)). Sgt. Eversole immediately handed the camera to C.O. Cornley standing nearby, took his pepper spray from his belt, and sprayed pepper spray directly into Wade's face from about twelve inches away. (Depo. Eversole 157:17 (Ex. 29A, at 3:57).) Eversole sprayed Wade in the eyes, stating "So it's called a – it's kind of a target of opportunity. I was just trying to strike his facial area, sir, to gain compliance." (Depo. Eversole 160:6.)

The video shows Wade beginning to struggle at three minutes and fifty-two seconds into the video. Eversole began pepper spraying Wade at three minutes and fifty-seven seconds into the video. Eversole admitted during his deposition that at the time of the first spraying, he knew Wade was handcuffed and that he was partially restrained in the restraint chair with the lap belt and both leg restraints. (Depo. Eversole 159:11, 176:4.) Immediately after being sprayed, Wade stopped struggling, and leaned all the way forward. He began coughing, and when the handcuff on his left arm was removed, he brought his left hand to his mouth to cover his cough.

(Depo. Eversole 160:11. (Ex. 29A, at 4:08)). Eversole then again sprayed Wade in the face with the pepper spray a second time, at four minutes and nine seconds into the video. (Ex. 29A, at 4:09); Depo. Eversole, p. 161). During the second pepper spraying, Eversole acknowledged that Wade's ankles were still secured to the chair, the lap belt was still on, Lightner still had control of his left hand and another corrections officer still had his right hand in the handcuffs behind his back. (Depo. Eversole 162:11, 176:15.)

After the second pepper spraying, Eversole put his forearm across Wade's neck pinning him to the back of the chair. (Depo. Eversole 162:11.) Wade repeatedly stated, "I can't breathe. I can't breathe." (Ex. 29A, at 4:22). During this time C.O. Ben Walters grabbed Wade's jaw from behind lifting up, applying pressure on his hypoglossal nerve. (Exhibit 2; Depo. Eversole 163:8.) The other corrections officers then secured the remaining arm restraint and both shoulder straps. Id.; (Ex. 29A, at 4:22-5:31). Wade was then wheeled into an isolation cell. (Depo. Eversole 164:14.)

As Wade was being wheeled away, another inmate began banging on his cell door in protest about the treatment that he just witnessed. In response, Eversole can be heard on the video yelling a threat back to the inmate: "You're next…..you keep it up…..you are next!". Eversole admitted making this threat and claimed it was a verbal warning to another inmate. (Depo. Eversole 215:22, 219:14.)

Defendants Eversole, Lightner and the other corrections officers involved with Wade all testified that they were not in fear of physical harm and that Wade never tried to harm them (did not spit, bite, kick, punch or any other kind of overt act).(Depo. Eversole 184:1.) See also Exhibit 1 (narrative reports) and Exhibit 3 (use of force report).

Approximately a minute after they pepper sprayed Wade, one of the officers asked if a medic had been summonsed. (Ex. 29A, at 6:24).  A few minutes later, a nurse arrived to "decontaminate" Wade. (Restraint Watch Report, identified as Exhibit 24 to the Deposition of Nicole Hochwalt, ECF 60)  This consisted of pouring a few ounces of water over his eyes. The nurse spent three seconds on the process.  After the decontamination, Wade continued to writhe in pain.  The nurse returned at 5:45a.m., after Wade had been in the restraint chair for an hour, and in the process of checking the restraints, rinsed Wade's eyes again. (Depo. Hochwalt, p. 57)

Wade was eventually released from the restraint chair over two hours and thirty-five minutes later. (Depo. Eversole, p. 167:9).  Per policy, an inmate should not be kept in the restraint chair for more than two hours. (Depo. Eversole 167:9; Exhibit 11.)  After being chaired, Eversole took two pictures of Wade's injuries. (Depo. Wade 85:6, 87:14.)  Eversole admitted that Wade had no injuries when he came to the jail but had an injury to his eye after this incident. (Depo. Eversole 181:10-182:18; Exhibit 4(a-d)).  Wade describes the injury to his eye from the pepper spraying as a chemical burn and that his eye now twitches involuntarily. (Depo. Wade 88:15, 92:10.)  Jail medical staff subsequently treated Plaintiff's eye injury with a cream and antibiotics. (Depo. Wade 85:5.)  Wade also sustained an injury to his wrist from Lightner's conduct. (Depo. Wade 92:1.)

Two days later, on October 19, 2016, Wade attempted to file a grievance or complaint alleging excessive use of force. (Depo. Wade 84:16, 90:3.)  Sgt. Mark Shively spoke with Wade about filing a grievance.  He explained to Wade that he had reviewed the video from the pepper spraying and that he could not file a grievance or complaint against Eversole as reflected in his

written report. (Depo. Wade 84:24; Exhibit 23, Eversole 205:16.)   This is despite the policy and practice that a sergeant is not supposed to review another sergeant's use of force, as it requires review by someone higher up in the chain of command. (Depo. Plummer 24:22, 28:19; Eversole 201:13.)   The incident involving Wade was never investigated for excessive use of force at the Montgomery County Sheriff's office. (Depo. Eversole 207:3; Depo. Plummer 35:11, 42:17, 51:10.)

Wade points to a string of incidents to support his contention that Eversole and the Montgomery Jail have a history of using excessive force on restrained inmates in the Montgomery County Jail.   Before he was promoted to the rank of sergeant, Eversole had, as a road-patrol deputy, struck an inmate by the name of Kenneth Christman in the head after he was handcuffed and was laying on the ground. (Depo. Eversole 90:15.).   Shortly thereafter, Eversole was promoted to the rank of sergeant on January 3, 2015 and transferred into the Montgomery County Jail. (Depo. Eversole 16:11.) In the Fall of 2015, just a few months after his promotion, Eversole watched a video of Sgt. Judith Sealey pepper spraying inmate Amber Swink until she became unconscious while fully restrained in a restraint chair. (Depo. Eversole 102:22). Likewise, Lightner was the corrections officer who was ordered to open the door for Sgt. Sealy so she could spray Mrs. Swink with the pepper spray. (Depo. Lightner 14:1). Eversole also knew that Lightner participated in the incident involving Mrs. Swink. (Depo. Eversole 180:18.)

Approximately three (3) months before the incident involving Plaintiff Charles Wade, Sgt. Eversole also utilized pepper spray on another handcuffed inmate, Randy Desruisseau. (Depo. Eversole 92:19, 95:9; Depo. Plummer 93:23; Exhibit 26.)   As with Amber Swink, there

was no investigation into the incident. (Depo. Eversole 96:23). Major Scott Landis, who oversaw all jail operations, never investigated any use of force by Eversole. (Depo. Landis 24:6.)

On September 13, 2016 Amber Swink filed suit, making national news, being reported by the Washington Post. Still nothing was done internally to address the use of force issues within the jail. (Depo. Eversole 107:13, 108:16.). Just over a month after the Amber Swink incident became public, the incident involving Wade occurred.

On February 14, 2017, Wade filed the instant action asserting Excessive Use of Force, in violation of 42 U.S.C. §1983; Amendments 4, 8, and 14 to the United States Constitution, *Monell* liability for unconstitutional Policies and Procedure, also in violation of 42 U.S.C. § 1983. Failure to Supervise & Discipline 42 U.S.C. 1983; a state law claim for "Malice & Gross, Wanton, Willful and Reckless Wrongful Conduct;" as well as assault and battery against Defendants Eversole and Lightner; Intentional Infliction of Emotional Distress Against All Defendants in Their Individual Capacities; Conspiracy to Falsify And/Or Omit Required Reports and Conspiracy to Destroy Videotape Evidence; Spoliation of Evidence / Interference with Right to Remedy. ECF 1.

Defendants have now filed a Motion for Summary Judgment. ECF 61. The motion claims that no triable issues of fact remain and that Defendants Eversole and Lightner are entitled to qualified immunity, and that Defendants Eversole and Lightner are also entitled to summary judgment on the merits of the excessive use of force claim. The motion further asserts that Plaintiffs' official capacity claims must be dismissed and that Sheriff Plummer is not liable for any action taken in his personal capacity, that Montgomery County is not liable for *Monell* liability, and that Defendants Eversole and Lightner are entitled to state law immunity for

the state law claims of assault and battery, that Defendants are entitled to summary judgment on the intentional infliction of emotional distress and that conspiracy and spoliation claims should be dismissed.[2]

## II. Standard of Review

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set

---

2 Plaintiff does not dispute Defendant's motion for summary judgment on these claims. Summary judgment is granted on the conspiracy and spoliation claims.

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. at 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

With regard to the role of video evidence in determining a summary judgment motion, the Sixth Circuit has held:

> Where, as here, there is a videotape capturing the events in question, the court must view those facts in the light depicted by the videotape. However, where the video does not tell the whole story in a material respect, or reasonable jurors could interpret the video evidence differently, summary judgment is not appropriate. Moreover, even if part of a party's testimony is blatantly contradicted by an audio or video recording, that does not permit the district court to discredit his entire version of the events. In other words, that a recording blatantly contradicts a party's exact version of the events, or certain parts of his version, is not alone fatal at summary judgment. A recording must blatantly contradict a party's entire version of the events in material respects to each claim.

*Hanson v. Madison Cty. Det. Ctr.*, 6th. Cir. Case No. 17-5209, 2018 U.S. App. LEXIS 13261, *13-14 (May 22, 2018) (internal citations omitted); quoting *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012); *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. Analysis

**Excessive Use of Force – Defendants Eversole and Lightner**

Plaintiff charges Defendants Eversole and Lighter with excessive use of force. In response to Plaintiff's claims, Defendants allege that they are entitled to qualified immunity.

Courts apply the Fourth Amendment's "objective reasonableness" test to allegations that government officials used excessive force during the booking process. *Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013) ("not the Fourteenth Amendment's "shocks the conscience" test or the Eighth Amendment's "cruel and unusual punishment" test"). "'[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.'" *Morabito v. Holmes*, 628 Fed. Appx. 353, 357 (6th Cir. 2015) (quoting *Kingsley v. Hendrickson*, ––– U.S. ––––, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015)).

In assessing objective reasonableness, courts look "to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying

11

intent or motivation of the defendants." *Burgess*, 735 F.3d at 472; see *Kingsley*, 135 S.Ct. at 2475–76 (rejecting a subjective standard). "The qualified immunity doctrine 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 320-21 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Courts ask two questions: (1) whether the plaintiff's federally-protected rights were violated, and (2) whether those rights were clearly established at the time. Id. "These questions may be answered in either order; if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Id*. (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). In the excessive-force context, the law is "clearly established" only if the plaintiff "identif[ies] a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017).; see also *Evans v. Plummer*, 687 F. App'x 434, 440 (6th Cir. 2017).

"[T]here is no need for any force when a detainee is handcuffed, non-threatening, and not trying to flee." *Burgess*, 735 F.3d at 470, 475. (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). See also *Evans v. Plummer*, 687 F. App'x 434, 441–42 (6th Cir. 2017).

The primary question is whether there was a need for Eversole or Lightner to use force in the form of pepper spray or wrist manipulation while securing Wade in the restraint chair. At the time these forces were utilized, Wade was already partially restrained in a restraint chair, sitting in the chair with both legs strapped in and lap belt secured and had his hands handcuffed

12

behind his back. (Depo. Eversole 159:11, 176:4, Ex. 29A, at 3:57). He could not stand up and was restricted from making any significant movement.

Major Scott Landis, who oversaw jail operations, admitted an inmate restrained in such a manner would be considered fully restrained. (Depo. Landis 43:6.). Wade was in the County Jail, surrounded by at least five members of the Jail staff. The corrections officers testified they did not feel threatened by Wade and he was not in a position to cause them any harm. (Depo. Eversole 183:6, 184:1; Depo. Lightner, 54) He did not try to harm them. Id. It does not appear that he could have harmed himself sitting strapped into the restraint chair with his arms handcuffed behind his back. The restraint chair is a wide-based chair on rollers, not susceptible to tipping over. Wade was complying with being strapped into the chair up until the point that Lightner manipulated his wrist.

Assuming all facts in the light most favorable to Plaintiff, the Court cannot say that a jury could find Lightner's actions unreasonable. The officers needed to remove the handcuffs from Plaintiff, and some amount of force is reasonable in achieving this. More importantly, Plaintiff can point to no cases finding wrist manipulation to be a constitutional violation. Lightner is entitled to summary judgment, both because it cannot be said that his actions were unreasonable, and because case law has not established that his actions were unconstitutional, granting him qualified immunity.

The same cannot be said of Eversole. Wade was restrained, going nowhere, unarmed, surrounded by five officers, controlled by them. A jury would be entitled to find Eversole to have violated Wade's constitutional rights based on the evidence viewed in the light most favorable to Plaintiff. Moreover, it has been established that utilizing pepper spray on a

13

restrained inmate is an excessive use of force in violation of the Fourth Amendment. "[I]n the context of the police's use of chemical spray to subdue a suspect, we held that it was clearly established in 1999 that a police officer's use of pepper spray against a suspect after he was handcuffed and hobbled constituted excessive force." *Bultema v. Benzie County*, 146 Fed. Appx. 28, 37 (6th Cir. 2005); citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004). "[T]he use of pepper spray on a handcuffed and hobbled person has been clearly established to be excessive force." *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009); citing *Champion*. "We have precedents stretching back at least to 1994 indicating that spraying a suspect with mace — then the equivalent of later-developed pepper sprays and electroshock devices — can amount to excessive force if used unreasonably against a non-resisting suspect." *Schmalfeldt v. Roe*, 412 Fed. App'x 826, 828 (6th Cir. 2011); citing *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994). Also, "pretrial detainees cannot be subjected to the use of excessive force that amounts to punishment, precisely because they cannot be punished at all." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 538 (6th Cir. 2015) (internal quotations omitted).

**Pattern and Practice**

The remaining two branches of Wade's constitutional claims are for unconstitutional policies or procedures and unconstitutional failures to supervise or discipline employees. As these claims all fall under the United States Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), they will be addressed together. Plaintiff alleges Montgomery County has an unconstitutional policy of allowing its corrections officers to use excessive force and points out that it has failed to meaningfully investigate uses of force and thus ratified all but one use of force by Montgomery County jail officers.

14

A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. See *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), and *Burgess*, 735 F.3d at 478.

Wade asserts that the Montgomery County Sheriff cultivated a "custom of tolerance or acquiescence" toward uses of excessive force at the Montgomery County Jail, thus leading the officers to believe that they would not be disciplined for using excessive force and encouraging them to do so. To prove a claim for municipal liability under this theory: (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation. *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996).

Plaintiff points to evidence from seven prior cases that support his *Monell* claim; *Swink v. Montgomery County*, *Wallace v. Montgomery County*, *Aldinin v. Johnson*, *Hopper v. Plummer* (*Richardson*), *Pate-Strickland v. Montgomery County*, *Evans v. Montgomery County*, and *Guglielmo v. Montgomery County*. (Doc #72, PID #2009-2012). Plaintiff notes that of these

seven cases he cites, five have been settled and two are still pending before this court, *Hopper* (*Richardson*) and *Guglielmo*. (Doc #72, PID #2012).

Defendant claims that Federal Rule of Evidence 408 forbids looking to these cases for evidence of a pattern. However, Federal Rule of Evidence 408 only limits the use of settlement conversations "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement," neither of which is the purpose for which it is offered here. See *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 271 n.9 (D. Mass. 2016).

While the Court will not take judicial notice of these cases, Plaintiff may be able to introduce evidence from these cases or testimony regarding them at trial on the existence of a pattern of practice. The Court will bifurcate the trial question of Eversole's liability from the existence of a pattern or practice. Evidence of a pattern or practice will only be presented if a jury finds that Eversole has violated Plaintiff's right to be free of excessive use of force.

**Intentional Infliction of Emotional Distress**

Under Ohio law, the elements of a claim of IIED are:

> "(1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it."

*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (quoting *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App.3d 557, 698 N.E.2d 503, 506 (1997)). "Serious" emotional distress must be "severe and debilitating." *Long*, 193 F. App'x at 503. A

reasonable juror could find that pepper spraying a restrained individual meets the elements of intentional infliction of emotional distress.

**State Law Immunity for the State Law Claims of Assault and Battery**

Defendants assert Sgt. Eversole and Officer Lightner are entitled to immunity under Chapter 2744 of the Ohio Revised Code for the state law claim of battery. In Ohio, a police officer is immune from liability in performing a governmental function unless the officer's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). The Southern District of Ohio has recognized and discussed how Ohio law defines the terms "malice," "bad faith," "wanton" and "reckless" in the context of O.R.C. § 2744.03(A)(6)(b). See, e.g., *Collin v. Stephenson*, 2002 U.S. Dist. LEXIS 21573, S.D. Ohio No. C2-00-494 (S.D. Ohio 2002). All of the terms involve conduct greater than mere negligence. See *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, (1st App. Dist. 1995).

The pepper-spraying of Wade would support a finding that Eversole acted with malicious purpose, bad faith, wantonness, or recklessness in dealing with Evans. Such is not the case with regard to Lightner. Lightner is entitled to immunity under Chapter 2744. The claims for battery and assault against Eversole may go forward.

**Official Capacity Claims**

Claims under 42 U.S.C. § 1983 are, in all respects other than name, claims against the entity, not against individuals in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "Official-capacity suits (…) 'represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991), quoting

17

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978); *Essex v. County of Livingston*, 518 Fed. Appx. 351, 354 (6th Cir. 2013). Where the governmental entity itself is also a defendant, a claim against an official or employee of the entity in their official capacity is superfluous or redundant. *Slocum v. City of Cleveland Heights*, USDC Case No. 1:14-CV-00532, 2014 U.S. Dist. LEXIS 83700, *8 (June 19, 2014, N.D. Ohio). This pertains to all individuals named as Defendants,

Sheriff Plummer is not liable for any action taken in his Personal Capacity. The record contains no evidence that Sheriff Plummer was involved in any manner with the force utilized on Wade. Plaintiff fails to make any statements regarding allegations that Sheriff Plummer personally did anything in relation to the incident with Wade.

Similarly, Plaintiff has no evidence to establish any claims against Defendant Landis. See *Frodge v. City of Newport*, 501 F. App'x 519, 532 (6th Cir. 2012) ("even if Simmons had violated Plaintiffs' constitutional rights, their supervisory liability claims would still fail. Plaintiffs argue that Hall, Morgan, and Kunkel ratified Simmons's conduct by failing to investigate the incident and failing to discipline Simmons for making an invalid arrest and using excessive force. This is insufficient to make supervisors liable for their subordinates' conduct. Plaintiffs must present evidence that Hall, Morgan, and Kunkel 'did more than play a passive role in the alleged violation.... Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.' *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir.1999)").

**Conclusion**

Because there is no evidence Defendant Lighter behaved in an unreasonable manner and because case law does not clearly establish that it is unconstitutional to manipulate a detainee's wrists while trying to secure him in a chair, Defendants' motion to dismiss is **GRANTED** with respect to Lighter.  Because it is clearly established that an officer may not pepper spray a restrained detainee and because Eversole's actions were unreasonable when viewed in a light most favorable to Plaintiff, Defendants' motion is **DENIED** with respect to Eversole.  Because there is evidence that would support a finding of malice against Eversole, but not Lightner, and because Eversole's actions could be found to shock the conscience, the motion is **GRANTED** with regard to the state law claims against Lightner, but **DENIED** with regard to the state law claims against Eversole.  Because supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act, the motion is **GRANTED** with regard to Landis.  Because Plaintiff agrees that he has no conspiracy claim or spoliation claim, the motion is **GRANTED** with regard to these claims.  Because Plaintiff has evidence that, if believed, would constitute a pattern or practice violating rights, Defendants' motion is **DENIED** with respect to Plaintiff's *Monell* claim.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, December 4, 2018.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE